I would have preferred my first appearance in this forum rather than the different circumstances. My ruminations about the – in preparing for today about the underlying facts, my own failings, and the castigation that I feel that I have endured in the underlying case have not left me pain-free. Nevertheless, let me say that it is our fundamental position that the dismissal affected a disproportionate toll upon my clients ultimately. As an example of that, it was important to me to maintain magic as a viable defendant in this case. Nevertheless, unlike the cases, defense cases of Al-Turki and Ash versus Kvetov, I believe, it never occurred to me to suffer, to allow, or to cause this ultimate dismissal that occurred in this case as a means, as I found in some of these other cases referred to, to circumvent the finality rule. I was reassured at the second renewed scheduling conference by Magistrate Judge O'Neill that the appealability issue as to magic was preserved, and so I proceeded with what I believe was reasonable diligence, attending more than 100 depositions, responding to written discovery, and so on. I'd like to return to the importance of maintaining magic as an entity and then return to the dismissal in a moment. It was important in my thinking to maintain magic as a person for two reasons. One was on principle that this proliferation of multi-agency law enforcement associations has proliferated nationally. There were a couple of additional cases citing HIRVE that came out of the South, I believe. Relying upon HIRVE's intent of the Founders' Test to find that these joint agencies are not persons. Nevertheless the difficulty, of course, is that you had the option of either accepting the ruling and letting everything go and appealing it, or wait until the end and then appeal it, right? Yes. And the unfortunate consequence of what happened is that you, in effect, lose that I understand that principle as it's laid out in Al-Turki, the case that the defense cites. It's our position that the circumstances here are quite different than those presented in Al-Turki. In that case, there was an individual who was found absolutely to have the knowledge, and to have willfully chosen to fail to appear for both the pretrial conference and for trial. At the time of the last of the underlying events, if you will, here, I believe we were still 45 to 60, perhaps, approximately, days from trial in this case. And on that topic, with regard to the second of the Henderson factors, courts need to manage its docket. One of the statements of the district court was that regarding its control over its docket was that both the pretrial conference and the trial would likely have to be put over by my last request for more time to respond to what are obviously voluminous summary judgment motions. But I think that is based on an assumption that the rulings on the summary judgment had to be made before the scheduling conference took place. And I don't think that that's necessarily accurate. The court could have allowed the scheduling conference and the trial to remain scheduled as they were and proceeded with them, and proceeded with the scheduling or rather the pretrial conference, despite the fact that there might not have been a ruling on the summary judgments at that time. One of the available alternatives that I believe would have been available to the court was that if the court, after the pretrial conference, granted the summary judgment motions, then to impose some form of sanction for the time that the defense would have spent needlessly at the pretrial conference. Court also found that, you know, the difficulty that I had that put me back one week from paying the sanctions to the defense the first time precluded me or precluded the court from having that as an available option later. But I think that the payment in full of those sanctions that had been first awarded and that, I will add an afterthought, I'm not so certain there was a finding of willfulness that really justified the sanctions, but I did, I guess you could say invite that. Nevertheless, I feel that that was an available option to the court to allow those the pretrial conference and the trial to remain scheduled, despite the fact that a ruling on the summary judgments might not have occurred by that time. I think the Court is assuming one has to come before the other, and I don't think that's necessarily true. If I may return for a moment to the importance of magic here as an entity. One of the points that I did want to make here is that it was important to maintain magic to me in principle, but also because of difficulties in proof inherent in this case. This case is a little bit like the Jones v. Williams case, which is the case I remember as the urine in the iron case, where a team of law enforcement officers searched a home. Later, the homeowners found while ironing that there was a smell of urine, but they This case presents a somewhat similar circumstance in that my clients were, at each of the homes that were searched, held in the front rooms while officers searched the remainder of the homes. And so my clients would have difficulty identifying any particular officer from a particular team as having perpetrated these events. In that respect, it makes this case like Jones in that it almost needs to rely upon a conditional res ipsa theory, such that if a trier of fact were to believe my clients that their property was stolen during the various searches, that the burden would shift to the defense to disprove their liability if possible. Now, what distinguishes But a res ipsa theory doesn't depend on there being a distinct entity. I mean, there would be individual defendants who would be liable under res ipsa theory. Typically, that's true, Your Honor. However, what distinguishes this case from situations such as the Jones or perhaps the James v. Southern as well is that the members of the team in this particular case could not be, well, were not permanent employees of either police or sheriff or probation or parole or CHP, but they were, each team was comprised of members from some of these different agencies. So even if one pursues to, through a Monell theory, to try and get to the employing entity, in this case you can't, because you can't show which one of the officers  Instead, all of these searches were conducted under the auspices and the umbrella and the separate organizational structure, the chain of command, day-to-day supervision of magic. That's why, when combined with the difficulty of proof that I thought it important in this particular case to try and hold or try and revisit the issue later on after the conclusion of the case of finding magic to be a person here. The defense has, nor did the Court in the underlying decisions, address themselves whatsoever to some of the California law on point here, particularly Government Code 6508, under which, if an agency is not one or more of the parties to the agreement, but is an entity, commission, or a board constituted pursuant to the agreement here, the MOU, and the agency is authorized to do a number of acts, including making in their contracts, then it is a public entity, essentially a joint powers agency. Neither the Court in the underlying decision nor the defense has addressed that. I see that my time is up here. Thank you. Weakley, I'm going to be speaking for the appellees in this case. The first question, of course, is whether or not the district court judge abused his discretion in dismissing the case and ordering a judgment of dismissal pursuant to Rule 41b. My intention is to address that first and to give the Court, to remind the Court a little bit of the history of what goes on. The appellants have not addressed, really, any of the numerous court violations and why there were court violations throughout the course of working on this case. This goes back to August of 2002, August 13 of 2002, where the district court judge ordered that Magic be dismissed as a defendant in a lawsuit and ordered the plaintiff to file an amended complaint. When the plaintiffs in that case filed their fifth amended complaint, they included Magic again in violation of the court order. Of course, that is the first violation of the court order. Instead of filing another motion to dismiss, as the parties had done before, the parties had all entered into a stipulated order that the plaintiffs in that case, the appellants here, would file a motion for reconsideration of that issue, and that the appellees then would have 20 days after the resolution of that issue in which to file a response of pleading. We went on for two years after that, handling discovery, without a motion for reconsideration ever being filed. We took 100 or more depositions, and in numerous times, counsel would ask the appellant's counsel about filing a motion for reconsideration. And in numerous times, counsel for the appellees would advise the appellant's counsel that it's our intention to file pretrial dispositive motions and we need operative pleadings to do that. At no time was a motion for reconsideration ever filed, even though the stipulated order says it will be filed. Again, that's another violation of the court order. All parties agreed to seek a subsequent status conference to reconsider certain dates, and at that status conference, which was held on July 14, 2004, with a magistrate judge, this issue was brought up. The issue of the pleadings was brought up before the magistrate judge, and he ordered the appellants to file a sixth-minute complaint, not including Magic as a defendant. And that complaint was ordered to be filed by July 28, 2004. When July 28 came and no sixth-minute complaint was filed, the appellees filed a motion to dismiss. That motion was filed on August 26. After that motion was filed, then a sixth-minute complaint was filed. Again, another violation of the court order. On October 25, the district court judge heard the motions to dismiss, and the district court judge weighed the factors set out in Thompson v. Housing Authority and Hernandez v. City of El Monte and went through the factors in evaluating whether or not a dismissal would be appropriate. And at the appellant's attorney's request, the court decided that the lesser sanction of awarding attorney's fees would be more appropriate than dismissing the case at that point. The court advised in the order, the order dated February or the order from the October 25 hearing, the court advised the appellant's counsel that he had a responsibility to timely and fully comply with court orders. Footnote 2 of that order specifically says, any future failure to timely comply with court orders or to seek an extension of time to comply prior to the date will result in the dismissal of this action. The court ordered the defendant's attorneys at that time to file declarations on reasonable attorney's fees. The court then filed a subsequent order, which is dated December 1, 2004, where the court ordered the amount of attorney's fees to be paid and ordered those fees to be paid within 30 days. Again, in the last sentence of that order, the court states, the court advised appellant's counsel, failure to timely comply with this order will result in a dismissal of this action. The 30 days comes and goes and no attorney's fees are paid, no request for an extension of time, nothing. So the appellees again file another motion to dismiss. After that motion to dismiss was filed and beyond the time for which the appellant's counsel had to file an opposition, he filed a late opposition, there was a hearing. That hearing is the hearing that's at issue here, the February, that resulted in the February 10, 2005 order. That hearing was on February 7, 2005. So by now we've had at least four violations of court orders. The court again went through the Hernandez and Thompson factors and balanced the factors and went through them and pointed out that the public interest in expeditious litigation, that this case is now over four years old, the courts need to manage its docket. The court pointed out that the appellee's attorneys had filed dispositive motions, which were scheduled to be heard in about a week. Appellant's attorney was now asking for more time to file an opposition. That had just come up a day or two before the hearing. And it was, again, it was late. He was late in filing or even requesting an extension to file an opposition. The court pointed out that he had some good reasons why it was late, didn't he? He was supposed to, yes. He gave several reasons. Kennedy. Can I ask you about the reasons Judge Silverman just mentioned? There are a list of occurrences in the respect to the attorney's practice and life that he submitted. Were they submitted to the judge, those explanations? My understanding is they were submitted at the time of the hearing. I really don't. I think they were submitted before. Did the judge consider those reasons? Those are not among the factors that are generally considered, the five factors that you've listed. It doesn't include a category of explanations for the attorney's problems or difficulties that may have caused this. Should not there be such a fact, a category? You're talking about, for example, the computer crashing and an employee disappearing in the process? Yes, that list. And my understanding, and I didn't go back and review this particular document, but I recall that Appellant's counsel had filed something a day or two before the hearing, and I think these factors or some of these factors may have been set out. I believe that the district court judge considered these factors in going through his evaluation process. Does that answer the question? Yes. I just don't recall at the moment. He gave a written ruling where he evaluated those five factors, didn't he? He did not go through in his order and evaluate the plaintiff's reasons for them. No, no. He didn't do the plaintiff's reasons, but he did the other factors. Oh, I'm sorry. The factors under Thompson and then the other factors. Yes, he did. He did a very detailed analysis. Right. But he didn't consider in that order the counsel's explanations. Those explanations are not set out in the district court judge's order. The Court pointed out that to now grant an extension of time would necessitate having to have a whole new hearing date. The Court had set aside an entire day knowing the voluminous nature of these dispositive motions. The Court had cleared its calendar for that date, wouldn't let other attorneys to set matters. And now if the Court were to grant a further extension of time, it was going to necessitate another hearing date where the Court would have to clear its calendar. It would also necessitate, in the event that the Court denied the dispositive motions as to any parties, it would necessitate a continuation of the pretrial conference and the trial date, because parties cannot go to a pretrial conference not knowing what the nature of the pleadings are and who's going to be in the lawsuit. So the Court, in fact, the Court stated in the court order that this was resulting in havoc in managing the Court's docket. The Court pointed out there was prejudice to the defendants by these same things, that the defendants had to file numerous motions to dismiss and the probable delay of the trial and the pretrial conference and the trial date. The Court also evaluated now the whether or not lesser sanctions would be appropriate. And the Court specifically said that the plaintiff didn't comply before. What would the Court think the plaintiff would comply now? So in the Court's discretion, the Court granted the dismissal. And as the Counsel as we talked about earlier under the Altori case, because the dismissal was a 41B dismissal, the appeal of the magic issue, therefore, is inappropriate. It's inappealable. On the issue of whether or not magic is the dismissal of magic was appropriate, the Plaintiff's counsel looks at Government Code section 6500 and the sections that follow that. I would submit to the Court that those sections are designed to set up a joint powers authority, not to deal with intergovernmental law enforcement associations like task force. A task force is an association of law enforcement agencies, not a joint powers authority, which are set up for purposes of handling government issues such as providing a fund for excess liability coverage or for governmental agencies to join together to purchase property and that sort of thing. There was no intent under Government Code section 6500 to apply those sections to task force. And when we analyze, in fact, when we analyze the magic under the cases of Harvey and Timberlake, we see that magic is very, very similar to Harvey and Timberlake. For example, like Harvey, Harvey had a formalized policy and procedure for conducting searches. Magic has its standard operating procedure, the SOP, which counsel refers to. Like Timberlake, Timberlake had a board of directors and a unique source of funding. Magic has a policy and direction team and utilizes asset forfeiture funds very similar to the Harvey and Timberlake cases. And as Harvey and Timberlake both said the task force there were not public entities that can sue and be sued, we would submit that magic is very similar. Thank you, Your Honor. Thank you. Roberts. Just two quick points. Government Code 6508 tells us that an agency shall have the power to sue or be sued in its own name if it has the power to contract. How magic could not be a person under 1983 and yet have the power to contract to be recognized by the State of California by virtue of the gun grant as an entity capable of contracting is beyond me. On the issue of the delay, finally, I would like to say that as was laid out in the Henderson dissent, it strikes me that the district court's deliberations here, while it did recite the Henderson factors, appears to me to reflect more of a concern for, as the court put it in Henderson, tidy dispatch of cases than for fairness to the litigants. Thank you. Thank you, Your Honor. The case to be submitted.
judges: Reinhardt, Rymer, Silverman